**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UBIQUITOUS CONNECTIVITY, LP, | CIVIL ACTION NO. |
| | 4:18-cv-00368-JED-FHM |
| Plaintiff, | |
| | **JURY TRIAL DEMANDED** |
| v. | |
| | |
| CENTRAL SECURITY GROUP - | |
| NATIONWIDE, INC., | |
| | |
| Defendant. | |

<u>**NOTICE OF SUPPLEMENTAL AUTHORITY
IN FURTHER SUPPORT OF
UBIQUITOUS CONNECTIVITY'S MOTION TO AMEND ITS COMPLAINT
[Dkt. No. 34]**</u>

After briefing was complete for Plaintiff UBIQUITOUS CONNECTIVITY, LP's

(hereinafter, "Ubiquitous") Motion to Amend Its Complaint (Dkt. No. 34),[1] three opinions were

issued by District Courts in California that provide for amendments to a complaint when a motion

to dismiss on Section 101 is granted.[2]

1. *SkyHawke Techs., LLC v. DECA Int'l Corp.*, No. CV 18-1234-GW(PLAx) (C.D. Cal. Feb. 4, 2019 [copy attached as **Exhibit AA**]: Judge Wu granted Defendant's Motion for Partial Judgment On The Pleadings that the asserted claims were patent-ineligible under 35 U.S.C. § 101.  The Court, however, allowed the Plaintiff an opportunity to amend its Complaint to address subject matter eligibility under Section 101 because the Federal Circuit had

---

[1]   Defendant Central Security Group – Nationwide, Inc. filed an Opposition (Dkt. No. 35) and Ubiquitous filed a Reply in support (Dkt. No. 37).

[2]   Dkt. No. 13: Defendant's Motion to Dismiss; Dkt. No. 27: Opposition; Dkt. No. 29: notice of supplemental authority; Dkt. No. 31: Reply in support; Dkt. No. 32: Correction to Dkt. No. 27); Dkt. No. 38: notice of supplemental authority.

recently warned in the *Aatrix* matter[3] that § 101 issues may involve factual issues that are not appropriate for decision at the pleadings stage of a case.  *See* Ex. AA, p. AA-8.

2. *Kajeet, Inc. v. Qustodio, LLC*, No. CV18-01519 JAK (PLAx) (C.D. Cal. Feb. 28, 2019 [copy attached as **Exhibit BB**]: Judge Kronstadt granted Defendant's Motion to Dismiss that asserted that the asserted claims were patent-ineligible under 35 U.S.C. § 101. However, the Court granted leave for the Plaintiff to amend its Complaint to include an expert declaration and allegations concerning Section 101.  *See* Ex. BB, p. BB-8.

3. *RingCentral, Inc. v. Dialpad, Inc.*, No. 18-cv-05242-JST, 2019 U.S. Dist. LEXIS 37901 (N.D. Cal. Mar. 8, 2019) [copy attached as **Exhibit CC**]: Judge Tigar granted Defendant's Motion to Dismiss under 35 U.S.C. § 101 but allowed the Plaintiff an opportunity to amend its Complaint to "attempt to plead patent eligibility" (citing *Aatrix*).  *See* Ex. CC, CC- 10 at *33.

Each of these recent opinions provides additional support for Ubiquitous' Motion to

Amend Its Complaint.

---

[3]  *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121 (Fed. Cir.2018).

Dated: March 20, 2018

Respectfully submitted,

/s/ Jonathan R. Miller

**RIGGS, ABNEY, NEAL, TURPEN,
ORBISON & LEWIS, P.C.**
Chad C. Taylor (OK 18308)
528 N.W. 12th Street
Oklahoma City, Oklahoma 73103
Telephone: (405) 843-9909
Facsimile: (405) 842-2913
Email: ctaylor@riggsabney.com

**HENINGER GARRISON DAVIS, LLC**
James F. McDonough, III (GA 117088)*
Jonathan R. Miller (GA 507179)*
Travis E. Lynch (GA 162373)*
3621 Vinings Slope, Suite 4320
Atlanta, Georgia 30339
Telephone: (404) 996-0869, -0863, -0867
Facsimile: (205) 547-5504, -5506, -5515
Email: jmcdonough@hgdlawfirm.com
Email: jmiller@hgdlawfirm.com
Email: tlynch@hgdlawfirm.com

*Attorneys for Plaintiff
Ubiquitous Connectivity, LP*

* admitted *Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 20th day of March, 2019, I caused to be electronically-

filed the foregoing document with the Clerk of Court using the CM/ECF system, which caused it

to be served on counsel who have appeared in this matter by electronic mail.

*/s/ Jonathan R. Miller*
Jonathan R. Miller

**EXHIBIT AA**

*SkyHawke Techs., LLC v. DECA Int'l Corp.*, No. CV 18-1234-GW(PLAx) (C.D. Cal. Feb. 4, 2019 (Slip Opinion granting Motion for Partial Judgment On The Pleadings With Leave to Amend Complaint)

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 18-1234-GW(PLAx) | Date | February 4, 2019 |
|---|---|---|---|
| Title | *SkyHawke Technologies, LLC v. DECA International Corp.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE |
|---|---|

| Javier Gonzalez | Katie E. Thibodeaux | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Kunal Jain | Joseph S. Cianfrani |
| Thomas J. Fisher | Daniel P. Hughes |

**PROCEEDINGS:    DEFENDANTS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS UNDER 35 U.S.C. § 101 [218]**

Court hears oral argument. The Tentative circulated and attached hereto, is adopted as the Court's Final Ruling. The Court would GRANT the Motion with leave for SkyHawke to amend its operative complaint by February 19, 2019.

A scheduling conference is set for February 28, 2019 at 8:30 a.m., with a joint report re consolidation to be filed by noon on February 26, 2019.

| | : | 10 |
|---|---|---|
| Initials of Preparer | JG | |

N.D. OKLA. CASE NO. 4:18-CV-00368-JED-FHM                              Page |AA-1
NOTICE OF SUPPLEMENTAL AUTHORITY IN FURTHER SUPPORT OF UBIQUITOUS CONNECTIVITY'S
MOTION TO AMEND ITS COMPLAINT [Dkt. No. 34]

*SkyHawke Technologies, LLC v. DECA International Corp.,* Case No. 2:18-cv-01234-GW-(PLAx)
Tentative Ruling on Motion for Judgment on the Pleadings

## I. Introduction

On December 6, 2010 Plaintiff SkyHawke Technologies, LLC filed this action for patent infringement against Defendant DECA International Corp. in the Southern District of Mississippi. Docket No. 1 (complaint); *see also* Docket No. 66 (currently operative amended complaint"). After some motion practice related to venue and the pleadings, the S.D. Miss. court granted a motion to stay pending *inter partes* review.  Docket No. 97.  The case remained stayed from late 2012 to early 2017.  In June 2017, soon after the Supreme Court's decision in *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 137 S. Ct. 1514 (2017), DECA renewed its venue challenge. DECA's motion was initially denied, but ultimately granted on a motion for reconsideration. Docket Nos. 150, 175.  The matter was transferred to this District on February 14, 2018.  Docket No. 177 (Receipt of Case Transferred In).  After a schedule was entered (Docket No. 205), the parties requested a stay of proceedings pending a settlement meeting.  Docket No. 210.  After good faith attempts at settlement were unsuccessful (Docket No. 213), a new schedule was entered in the case.  Docket No. 217.

On December 27, 2018, DECA filed the pending Motion for Partial Judgment on the Pleadings.  Docket No. 218.  The Motion has been fully briefed.  *See* Docket No. 224 (Opposition); Docket No. 226 (Reply).

For the reasons stated herein, the Court would **GRANT** the Motion, but with leave for SkyHawke to amend its operative complaint.

## II. Background

SkyHawke is the owner by assignment of U.S. Patent No. 6,456,938 ("the '938 Patent") and U.S. Patent No. 7,118,498 ("the '498 Patent") (collectively, "Asserted Patents").  SkyHawke argues that "DECA International has been and is now making, using, selling, [and/]or offering for sale, within the United States, GPS devices for use on golf courses, [and systems relating thereto]" that infringe one or more claims of the Asserted Patents.  Amended Complaint, ¶¶ 1, 17.

Only the '938 Patent is the subject of the current Motion.  The '938 Patent is titled "Personal DGPS Golf Course Cartographer, Navigator and Internet Web Site with Map Exchange and Tutor" and was issued on September 24, 2002.  The '938 Patent explains that "[g]olfers

1

NOTICE OF SUPPLEMENTAL AUTHORITY IN FURTHER SUPPORT OF UBIQUITOUS CONNECTIVITY'S
MOTION TO AMEND ITS COMPLAINT [Dkt. No. 34]

naturally pursue methods and tools to help them improve their golf game . . . . The value of an informational tool to a golfer increases as the amount and accuracy of information the tool provides increases." '938 Patent at 1:16-17, 1:28-30. The '938 Patent then describes "several U.S. patents which relate to Global Positioning System (GPS) which provide accurate positional information to a golfer." *Id.* at 1:30-32. The '938 Patent notes that many of these prior art patents "are under the control of the course manager and are, therefore, optimized for the manager's use." *Id.* at 1:35-36. The '938 Patent describes shortcomings with these systems:

> These patents describe systems that are designed for purchase, installation, configuration and management by a golf course owner or manager. They fail to disclose a golfer owned and operated position information based system for use on any golf course by the golfer. Also, a disadvantage of course based systems is that golfers may feel continually monitored or bombarded by unwanted advertisements the course provided system creates, thus diminishing the quality of the golfing experience. Additionally, course based systems necessitate locating the GPS antenna on a self-propelled or pull-type cart which can be difficult or impossible to locate exactly where the golf ball is lying as is desirable for optimum performance.

*Id.* at 1:47-59. The '938 Patent later provides a list of "objects of the invention," including,

> An object of the present invention is to provide an individual player owned dGPS system that enables a golfer to positionally map and/or play a golf course whether or not the course offers positional equipment or information. Another object of the present invention is to provide previously created maps for downloading and editing by users and to provide for the uploading of maps and play data through a public access computer system such as the Internet.
> * * *
> Another object of the present invention is to provide for a personal dGPS system that provides the user with complete autonomy from course owners and course owned systems with no additional reoccurring service fees or compensation for its use.
> Another object of the present invention is to provide a dGPS system that is operational on golf courses that do not have on-site positioning systems.
> * * *
> The present invention provides a heretofore absent method of golf course map creation, ongoing map modification, and map exchange between golfers worldwide via publicly accessible networks such as the Internet. It also provides a novel, on-site, dGPS mapping method and Graphical User Interface (GUI) mapping software specifically designed for easily mapping golf courses and especially effective for on site real-time editing to correct errors in a map.

*Id.* at 5:21-29, 6:5-12, 6:34-42

SkyHawke argues that DECA infringes Claims 1, 2, 4, 8, 9, 10, 13, 14, 20, 21, and 22 of

2

NOTICE OF SUPPLEMENTAL AUTHORITY IN FURTHER SUPPORT OF UBIQUITOUS CONNECTIVITY'S
MOTION TO AMEND ITS COMPLAINT [Dkt. No. 34]

the '938 Patent.  *See* Docket No. 219 at 1 n.2 (citing Docket No. 220-1, Ex. B (ECF51-64) (SkyHawke's Infringement Contentions, dated November 2, 2018)).   Claims 1 and 13 are independent claims.  Claim 1 is illustrative[1] and recites:

> 1.   A method of storing and communicating sets of topographic information to and from information processing and viewing devices by means of an accessible electronic network, each of the sets being specific to an individual golf course, comprising the steps of:
>> (a) inputting a first set of information to a first information processing and viewing device, said first set of information being data representative of a golf course topography, said first set of information including data elements relating to attributes of the golf course, said data elements including at least one location for each of said attributes in the set and said first information processing and viewing device executing course-mapper software;
>> (b) transmitting said first set of information from the first information processing and viewing device to the network; and
>> (c) accessing said first set of information through said network with a second information processing and viewing device with autonomy from any positional equipment at the golf course, said second information processing and viewing device executing course-player software.

'938 Patent, Claim 1.

## III.  Legal Standard

### A.   Motion for Judgment on the Pleadings (Rule 12(c))

Rule 12(c) of the Federal Rules of Civil Procedure permits a party to move to dismiss a suit "[a]fter the pleadings are closed . . . but early enough not to delay trial." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is proper when, taking all allegations in the pleading as true, the moving party is entitled to judgment as a matter of law." *Stanley v. Trustees of Cal. State Univ.*, 433 F.3d 1129, 1133 (9th Cir. 2006); *Lyon v. Chase Bank USA, N.A.*, 656 F.3d 877, 883 (9th Cir. 2011).  A motion for judgment on the pleadings should only be granted if "the moving party *clearly establishes* on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law."  *Hal Roach Studios, Inc. v. Richard Feiner &*

---

[1] The parties dispute whether Claim 1 is ***representative*** of all of the asserted claims for purposes of § 101 analysis. That dispute need not be addressed at this time in light of the Court's other determinations regarding the Motion.  The Court notes, however, that beyond observing that Claim 1 is a method claim and Claim 13 is a system claim (Docket No. 224 at 19 n.3), SkyHawke "does not present any meaningful argument for the distinctive significance of any claim limitations" not found in Claim 1.  *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018).  The Court makes no determination regarding whether Claim 1 may/may not be considered representative of the dependent asserted claims of the '938 Patent beyond observing that it is the ***patentee*** who must raise identify the "distinctive significance" of particular claim limitations in this regard.  *Id.*

3

*Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989) (emphasis added); *Living on the Edge, LLC v. Lee*, No. CV-145982 MWF (JEMx), 2015 WL 12661917, at *4 (C.D. Cal. Aug. 25, 2015) ("Judgment on the pleadings under Rule 12(c) is warranted 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'") (quoting *Deveraturda v. Globe Aviation Sec. Servs.*, 454 F.3d 1043, 1046 (9th Cir. 2006)).

"Analysis under Rule 12(c) is substantially identical to analysis under Rule 12(b)(6) because, under both rules, a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy." *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (internal quotation marks omitted). Therefore, judgment on the pleadings is also proper when there is either a "lack of cognizable legal theory" or the "absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988); *see also* Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (declaring that a complaint may be dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory); *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) ("Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."). Under this analysis too, a court "must accept plaintiff's allegations as true and construe them in the light most favorable to the plaintiff," drawing all reasonable inferences from well-pleaded factual allegations. *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001); *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). The court, however, is not required to accept as true legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

B. Patent Eligibility Under 35 U.S.C. § 101

An invention or a discovery is patentable if it is a "new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. "In choosing such expansive terms . . . Congress plainly contemplated that the patent laws would be given wide scope." *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980). Still, the Supreme Court has identified exceptions to this wide scope to "distinguish patents that claim the building blocks of human ingenuity, which are ineligible for patent protection, from those that integrate the building blocks into something more." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S.

4

208, 217 (2014) (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.,* 566 U.S. 66, 89 (2012)) (internal quotations omitted).  These exceptions to patent protection are "laws of nature, natural phenomena, and abstract ideas." *Diamond v. Diehr*, 450 U.S. 175, 185 (1981).  While the boundaries of the judicial exceptions remain subject to further development, the Supreme Court has clearly stated the policy underlying those exceptions: avoiding patents that "too broadly preempt the use of a natural law [or abstract idea]." *Mayo*, 566 U.S. at 72.  Thus, patent law should "not inhibit further discovery by improperly tying up the future use of laws of nature [or abstract ideas]." *Id*. at 85.

In *Mayo*, the Supreme Court "set forth a framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 573 U.S. at 217.  The first step is to ask "whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* at 218.  If not, the claims fall within the scope of § 101 and are patent-eligible.  If the claims are directed to one of the exceptions, the second step is to search for an "inventive concept" that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the natural law [or abstract idea] itself." *Mayo*, 566 U.S. at 72-73.  In doing so, a court must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements provide for an "inventive concept" that 'transform[s] the nature of the claim' into a patent-eligible application." *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 78-79).  If, in considering the claim elements individually and as an ordered combination, they merely recite well-understood, routine, and conventional steps, they will not constitute an inventive concept for patent eligibility purposes.  *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018).

"Like indefiniteness, enablement, or obviousness, whether a claim recites patent eligible subject matter is a question of law which may contain underlying facts." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368-69 (Fed. Cir. 2018).  The Federal Circuit has held, for example, that fact questions may arise in the context of step two of the patent eligibility inquiry.  *Aatrix*, 882 F.3d at 1128 ("[w]hether the claim elements or the claimed combination are well-understood, routine, conventional is a question of fact.").  To the extent patent eligibility questions do turn on a factual issue, an accused infringer must prove invalidity by clear and convincing evidence.  *Microsoft*

5

NOTICE OF SUPPLEMENTAL AUTHORITY IN FURTHER SUPPORT OF UBIQUITOUS CONNECTIVITY'S
MOTION TO AMEND ITS COMPLAINT [Dkt. No. 34]

*Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 112 (2011).

## IV.  Discussion

DECA argues that the asserted claims of the '938 Patent are patent-ineligible under § 101 because they are directed to an abstract idea and fail to recite any elements, either alone or in combination, that are not well-understood, routine, or conventional.  *See generally* Docket No. 219.  SkyHawke argues that the claims are drawn to a technological improvement that survives *Alice* Step 1 and/or recite particular elements that provide an inventive concept under *Alice* Step 2.  Docket No. 224 at 11-19.

SkyHawke's opposition specifically emphasizes Claim 1 of the '938 Patent's recitation of (1) a "*first* information processing and viewing device" that "execut[es] course *mapper* software;" (2) a "*second* information processing and viewing device" that "execut[es] course *player* software;" and (3) the requirement that the second information processing and viewing device acts "with autonomy from any positional equipment at the golf course."  *See, e.g.* Docket No. 224 at 14 (emphasis in original) (quoting '938 Patent, Claim 1); *see also id.* at 13.  In particular, SkyHawke also characterizes the course mapper software of the first information processing and viewing device as "creat[ing] geo-enabled course maps, *e.g.*, a GPS-enabled map."  *Id.* at 14. SkyHawke elsewhere suggests that the claimed method and/or system of the asserted claims of the '938 Patent are able to "determine the golfer's actual position on the golf course as the golfer moves about the course and then accurately determine and provide distances to other points from the golfer's actual position."  *Id.* at 12; *see also id.* at 13 ("The invention claimed in the '938 Patent provides accurate, interactive, real-time, GPS-derived distance information from the golfer's location on the course.").  Although SkyHawke is not explicit in its characterization of these particular arguments, they appear to be related to *Alice* Step 2.  (SkyHawke includes a separate section asserting that the claims provide a technical solution to a technical problem, but that section does not specifically reference these claim limitations in the same manner, *see id.* at 15-19.)

DECA responds by observing that SkyHawke's proposed claim construction for the term "course-mapper software" was "[s]oftware installed on the computer device used to generate map data for golf courses" and for the term "course-player software" was "software installed on the computer device related to player data."  Docket No. 226 at 6 (citing Docket No. 227-1 at 3 (Plaintiff's Patent Local Rule 4-2(a) and 4-2(b) Disclosures, served January 15, 2019)); *see also id.* at 10 (stating of SkyHawke's assertions regarding the first and second information and

6

NOTICE OF SUPPLEMENTAL AUTHORITY IN FURTHER SUPPORT OF UBIQUITOUS CONNECTIVITY'S
MOTION TO AMEND ITS COMPLAINT [Dkt. No. 34]

processing viewing devices, "these functions are not recited in the claims, nor does SkyHawke claim that these functions are present in their proposed claim constructions. Accordingly, this argument is irrelevant."). DECA also argues that the claim phrase "with autonomy from any positional equipment at the golf course" is result-oriented, functional claim language "without any technological basis in the claim" and thus does not change the analysis. *Id.* at 11.

The Court has some concerns about SkyHawke's arguments. First and foremost, SkyHawke's opposition arguments regarding *Alice* Step Two are not in any way reflected in SkyHawke's operative complaint. *See* Docket No. 66. In deciding a Motion for Judgment on the Pleadings, the focus – obviously − must be on what is disclosed in the pleadings, not simply on attorney argument. The Court acknowledges that SkyHawke's operative pleading was filed in November 2011, predating even the Supreme Court's decision in *Mayo*. Docket No. 66. The Court questions why SkyHawke has not sought leave to amend its complaint in light of the significant caselaw that has developed in this area since that time.[2] In particular, and only just recently, the Federal Circuit's decision in *Aatrix* reaffirmed the notion that § 101 disputes may involve factual issues that are not appropriately decided at the pleading stage. *Aatrix*, 882 F.3d at 1128 ("Whether the claim elements or the claimed combination are well-understood, routine, conventional is a question of fact. And in this case, that question cannot be answered adversely to the patentee based on the sources properly considered on a motion to dismiss, such as the complaint, the patent, and materials subject to judicial notice."). SkyHawke would put the burden on DECA to submit *evidence* to support DECA's position that the claims recite only routine and conventional components. Docket No. 224 at 4-6. But aside from some exceptions, evidence outside the pleadings is not properly considered in the context of a motion at the pleading stage. Instead, it is SkyHawke's responsibility to provide a well-pleaded complaint that can serve as the basis for this litigation, as well as the basis for SkyHawke's defense against a motion for judgment on the pleadings (along with the patent itself and material that can be subject to judicial notice). That has not occurred here.

Second, the Court agrees that there seems to be inconsistency between SkyHawke's arguments about the meaning of certain claim phrases in the opposition compared to the proposed claim constructions SkyHawke recently served in this case. The Court acknowledges DECA's position that for a motion on the pleadings, it may be appropriate for the accused infringer to

---

[2] Indeed, SkyHawke fails to even alternatively request leave to amend its complaint in its opposition to the Motion.

NOTICE OF SUPPLEMENTAL AUTHORITY IN FURTHER SUPPORT OF UBIQUITOUS CONNECTIVITY'S
MOTION TO AMEND ITS COMPLAINT [Dkt. No. 34]

simply adopt the patentee's apparent claim constructions in presenting a § 101 dispute.  Docket No. 219 at 7.  The Court also acknowledges SkyHawke's position on the other side, however, that DECA may have (intentionally or not) put its own "spin on these terms" that is inconsistent with SkyHawke's interpretation.  Docket No. 224 at 6.  This is particularly true given that SkyHawke's proposed constructions for the phrases "course-mapper software" and "course-player software" are fairly vague – there are likely multiple ways to interpret the constructions themselves.  Without SkyHawke's explanation of its understanding of the meaning of these terms (and its understanding of the meaning of its own constructions of these terms) in the context of claim construction, it becomes difficult to tell: (1) how much SkyHawke is shifting positions; and (2) what SkyHawke actually understands the scope of the claim language to be.[3]  Although DECA raises legitimate points about what appear to be discrepancies in SkyHawke's positions, the Court is ultimately concerned about whether "the nature of the claims is clear and it is apparent that claim construction would not affect the patent-eligibility of the claims at issue."  *Epic IP LLC v. Backblaze, Inc.*, No. CV 1:18-141-WCB, 2018 WL 6201582, at *15 (D. Del. Nov. 26, 2018) (J. Bryson); *see also Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012) ("it will ordinarily be desirable – and often necessary – to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter.").

After considering the parties' positions, the Court finds it would be premature to make a § 101 determination on the current record, particularly because SkyHawke's operative complaint does not include allegations that support its position.  SkyHawke will be permitted to file an amended complaint that attempts to address some of the issues raised by DECA in the briefing and in this Order and that attempts to provide support for any argument that the asserted claims include elements or a combination of elements that are not routine, conventional, or well-understood.  It is unlikely that the Court will provide SkyHawke with another opportunity like this, so SkyHawke should consider using it wisely.

---

[3] DECA makes a short assertion in its reply that even considering SkyHawke's interpretation of the claim language as provided in SkyHawke's opposition, the claims are still invalid.  Docket No. 226 at 10 ("using a GPS enabled map to determine distances on a golf course was a routine and conventional use of computers at the time of the '938 Patent.").  The Court is not persuaded that this general argument fully addresses SkyHawke's position regarding the relevance of the requirements of the first and second devices and their relationship to one another (the fact that the second device allows for autonomy may also be relevant when considered in this combination/context, despite its function-oriented nature).  As an aside, the Court also notes that some of DECA's arguments suggest that the relevant invalidity issue for this patent may not be a § 101 challenge, but instead an anticipation/obviousness challenge.

8

**IV.  Conclusion**

Based on the foregoing, the Court would **GRANT** the Motion with leave for SkyHawke to amend its operative complaint.  SkyHawke would be given 14 days from the date a Final Order is entered on the Motion to file an amended complaint that attempts to address the concerns identified by DECA and this Order regarding its allegations relating to the '938 Patent.

9

**EXHIBIT BB**

*Kajeet, Inc. v. Qustodio, LLC*, No. SA CV18-01519 JAK (PLAx) (C.D. Cal. Feb. 28, 2019 (Slip Opinion granting Motion Dismiss With Leave to Amend Complaint)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV18-01519 JAK (PLAx) | Date | February 28, 2019 |
|---|---|---|---|
| Title | Kajeet, Inc. v. Qustodio, LLC | | |

Present: The Honorable      JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE

| Andrea Keifer | Alex Joko |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:**      **(IN CHAMBERS) ORDER RE DEFENDANT'S MOTION TO DISMISS (DKT. 37)**

I.    **Introduction**

Kajeet, Inc. ("Plaintiff") brought this action against Qustodio, LLC ("Defendant") on August 24, 2018, alleging infringement of U.S. Patent No. 8,712,371 ("the '371 Patent"), U.S. Patent No. 8,630,612 ("the '612 Patent") and U.S. Patent No. 8,667,559 ("the '559 Patent"). Complaint, Dkt. 1.

On November 21, 2018, Defendant brought a Motion to Dismiss the Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) ("Motion"). Dkt. 37. In support of the Motion, Defendant argues that all claims of the asserted patents are invalid for failing to claim patentable subject matter under 35 U.S.C. § 101. Plaintiff opposed the Motion (Dkt. 43), and Defendant replied. Dkt. 46.

A hearing on the Motion was conducted on February 25, 2019, and it was then taken under submission. Dkt. 55. For the reasons stated in this Order, the Motion is **GRANTED** without prejudice, with any amended complaint to be filed within 14 days of the issuance of this Order.

I.    **Factual Background**

The '371 Patent issued April 29, 2014, and is titled "Feature Management of a Communication Device." The '612 and '559 Patents, although each issued prior to the '371 Patent (March 4, 2014 and January 14, 2014, respectively), are continuation patents of the '371 Patent. The '612 and '559 Patents share the same title and substantially the same specification as the '371 Patent.[1]

The Asserted Patents generally disclose methods and systems for "real-time management of a device, and more particularly to the establishment and enforcement of policies or rules associated with the feature or functions that may be performed with the device." '371 Patent at Abstract; *see also id.* at 1:47-50. The Asserted Patents state,

---

[1] All citations in this Order are to the '371 Patent unless otherwise noted.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV18-01519 JAK (PLAx) | Date | February 28, 2019 |
|---|---|---|---|
| Title | Kajeet, Inc. v. Qustodio, LLC | | |

[p]ostpaid cellular phone (cell phone) services typically allow the user of a cell phone to spend unlimited amounts of money for services. In other words, there is nothing to stop the user from running up a huge cell phone bill. Many parents have experienced this issue with their children, prompting the parents to take their children's phones away or to otherwise restrict their children's access to the phones. Unfortunately, modern society requires that parents have the ability to contact their children by cell phone and vice versa, so the cell phones are often returned to the children despite the possibility of future abuse.

'612 Patent at 1:66-2:9.

The Asserted Patents also state that "[t]he same type of issue exists between employers and employees and other parties in similar administrator/user relationships with respect to the use/abuse of cell phones and other devices." *Id.* at 2:10-13. The Asserted Patents describe the prepaid cell phone as one prior art solution to address these concerns, but explain that a shortcoming with such phones is that once all available time, i.e., credit, on the phone has been used, the service provider for the prepaid cell phone simply shuts down access to all services, such that "the child will not be able to call a parent in the event of an emergency." *Id.* at 2:39-40; *see also id.* at 2:27-41.

After describing some other prior art solutions and their shortcomings, the Asserted Patents explain the narrow issue that they intend to address is "providing limits on overspending and other activities by the user while simultaneously assuring that the user will always be able to use the phone when appropriately needed." *Id.* at 3:56-59.

The Complaint alleges that Defendant infringes "at least claims 1, 3, and 6 of the '371 Patent." Dkt. 1 ¶ 45. Claims 3 and 6 of the '371 Patent are dependent claims that depend from Claim 1. Claim 1 of the '371 Patent states:

1.    A system for managing a computing device, the system comprising:
a switch or a node configured to receive a request to or from the computing device to perform one or more functions associated with the computing device;
a policy decider operable to access one or more policies that control one or more functions associated with the computing device, the policy decider further operable to generate a decision to grant or deny the request based on the one or more policies; and
a policy enforcer operable to enforce the decision of the policy decider as to whether the request has been granted or denied by transmitting data to the switch or node, the data being indicative of one or more actions consistent with the decision to the switch or node.

'371 Patent, Claim 1.

The Complaint similarly alleges that Defendant infringes "at least Claims 1, 6, and 8 of the '612 Patent." *Id.* at ¶ 56. Claims 6 and 8 of the '612 Patent are dependent claims that depend from Claim 1. Claim 1 of the '612 Patent states:

1.    A system for managing computing devices configured to communicate over one or

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV18-01519 JAK (PLAx) | Date | February 28, 2019 |
|----------|--------------------------|------|-------------------|
| Title | Kajeet, Inc. v. Qustodio, LLC | | |

more networks serviced by one or more service providers, the system comprising a memory bearing instructions that, when executed on the system, cause the system to at least:

> store a policy that controls at least a use of a function on a computing device, the control comprising allowing and disallowing the use of the function based on a context associated with the computing device, the policy being defined by an administrator;
> group one or more computing devices in a group;
> associate the policy with the group;
> receive a request sent to or from a computing device in the group to use the function;
> generate a decision to grant or deny the request based on the policy; and
> enforce the decision by taking an action that is consistent with the decision and by sending to the computing device data indicative of the action, the action allowing or disallowing the use of the function on the computing device.

'612 Patent, Claim 1.

The Complaint has similar allegations as to Defendant's claimed infringement of "at least claim 27 of the '559 Patent." *Id.* at ¶ 33. Claim 27 of the '559 Patent states:

> 27.    A method for controlling a computing device configured to execute a function using a communication network managed by a service provider, the method comprising:
>> sending to a server a request to communicate with a remote computing device over the communication network;
>> receiving in real-time from the server a decision granting or denying the request, the decision being based on a policy stored at the server and configured by an administrator; and
>> enforcing the decision by enabling a communication with the remote computing device over the communication network when the decision grants the request and by disabling the communication when the decision denies the request, the communication being enabled or disabled without storing the policy on the computing device.

'559 Patent, Claim 27.

**II.    Analysis**

   A.    Legal Standards

      1.    Motion to Dismiss

Pursuant to Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." As the Supreme Court has explained:

   To survive a motion to dismiss, a complaint must contain sufficient factual matter,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV18-01519 JAK (PLAx) | Date | February 28, 2019 |
|---|---|---|---|
| Title | Kajeet, Inc. v. Qustodio, LLC | | |

accepted as true, to "state a claim to relief that is plausible on its face." [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)]. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556. . . . The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. [*Id.*] Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.*, at 557.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

*Iqbal* identifies "[t]wo working principles" that underlie the standard that applies to a motion to dismiss. *Id.* First, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'— 'that the pleader is entitled to relief.' " *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

      2.    <u>Section 101 Analytical Framework</u>

"Section 101 defines the subject matter that may be patented under the Patent Act." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010). Section 101 provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. "Section 101 thus specifies four independent categories of inventions or discoveries that are eligible for patent protection: processes, machines, manufactures, and compositions of matter." *Bilski*, 561 U.S. at 601.

Although the Supreme Court has recognized that "[i]n choosing such expansive terms . . . Congress plainly contemplated that the patent laws would be given wide scope," it has identified three exceptions to the application of Section 101: "laws of nature, physical phenomena, and abstract ideas." *Diamond v. Chakrabarty*, 447 U.S. 303, 308-09 (1980). These exceptions are not required by the text of the statute, but are consistent with the idea that certain discoveries "are part of the storehouse of knowledge of all men" and are "free to all men and reserved exclusively to none." *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948). Consistent with these principles is that "the concern that drives this exclusionary principle [is] one of pre-emption." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (citation omitted). Consequently, the Supreme Court has required that "[i]f there is to be invention from such a discovery, it must come from the application of the law of nature to a new and useful end." *Funk Bros.*, 333 U.S. at 130. These rules apply in the same manner to product and process claims. *Gottschalk v. Benson*, 409 U.S. 63, 67-68 (1972).

*Alice* is the most recent statement by the Supreme Court on the application of these principles. It expanded the two-step approach for resolving Section 101 issues adopted in *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 77 (2012). In the first step, a court must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Alice*, 573 U.S. at 217 (citing

Page <strong>4</strong> of <strong>9</strong>

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV18-01519 JAK (PLAx) | Date | February 28, 2019 |
|----------|--------------------------|------|-------------------|
| Title | Kajeet, Inc. v. Qustodio, LLC | | |

*Mayo*, 566 U.S. at 77). If this standard is satisfied, then in the second step the court must ask "[w]hat else is there in the claims." *Id.* This requires a consideration of "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent eligible application." *Id.* (citing *Mayo*, 566 U.S. at 78–79). In performing this second step of the analysis, a court must "search for an 'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* at 217-18 (citing *Mayo*, 566 U.S. at 72–73).

"[W]hether a claim recites patent eligible subject matter is a question of law," but it is one "which may contain underlying factual determinations." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018) (citations omitted). An example of such a factual determination is "[w]hether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent." *Id.* at 1369. Thus, a complaint that properly alleges that individual elements of a claim are not well-understood, routine, or conventional, may be sufficient to state a claim notwithstanding an invalidity challenge under Section 101. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018).

    B.    Application

In support of its position that the claims fail to satisfy step one of the *Alice* test,[2] Defendant argues that the claims of the Asserted Patents are directed to the concept of "managing access to functions based on policies." Dkt. 37 at 7. Defendant then argues that this concept is "predicated upon a basic human activity" and is necessarily an abstract idea. *Id.* at 8. Defendant relies primarily on two non-precedential Federal Circuit decisions for the proposition that managing access to content using policies is abstract. *See Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014 (Fed. Cir. 2017), *cert. denied*, 138 S. Ct. 689 (2018); *Smartflash LLC v. Apple Inc.*, 680 F. App'x 977 (Fed. Cir. 2017), *cert. denied*, 138 S. Ct. 687 (2018).

Plaintiff disputes this characterization of the claims and asserts that they instead are "directed to systems and methods for effecting policy-based controls over communication devices." Dkt. 43 at 13. Plaintiff then argues that,

> these claims require remote storage of usage policies which are thereby less vulnerable to manipulation by the user of the device(s) being managed while still accommodating real-time, continuous control during device usage, thereby improving the functionality of the computer-based systems through improved security, effectiveness, and robustness of the control accommodated.

---

[2] Defendant argues that representative claims of the Asserted Patents can be analyzed for purposes of the § 101 analysis. Dkt. 37 at 5-7. Plaintiff disagrees. Dkt. 43 at 11-12. In light of the approach adopted in this Order, it is unnecessary to decide whether it is appropriate to designate certain claims of the Asserted Patents as representative in determining whether the claims are invalid under § 101. *Berkheimer*, 881 F.3d at 1365 ("Courts may treat a claim as representative in certain situations, such as if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim or if the parties agree to treat a claim as representative."); *see also Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (agreeing with district court's decision to conduct representative claim analysis in its § 101 inquiry based on district court's determination that the claims at issue were "substantially similar and linked to the same abstract idea.")

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV18-01519 JAK (PLAx) | Date | February 28, 2019 |
|---|---|---|---|
| Title | Kajeet, Inc. v. Qustodio, LLC | | |

*Id.* at 6. Plaintiff relies primarily on two precedential Federal Circuit cases for the proposition that claims to computer technology that include a unique "architectural" arrangement of components have been found patent-eligible under 35 U.S.C. § 101. *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343 (Fed. Cir. 2018), *as amended* (Nov. 20, 2018); *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253 (Fed. Cir. 2017).

Plaintiff's position regarding the nature of the claims is premised on the assertion that each of the asserted claims requires, and there is a technological improvement created by, policies for managing computing devices that are stored separately from the computing devices. Plaintiff relies on the claim language itself to support its argument that the claims recite policies for managing computing devices that are stored remotely from the computing devices. Plaintiff's principle, cited support for the assertion that this arrangement creates a technological improvement, however, does not come from the intrinsic record of the Asserted Patents or from the Complaint. Instead it is based more on the Declaration of Charles D. Knutson submitted in support of Plaintiff's opposition to Defendant's Motion to Dismiss. Knutson Decl., Dkt. 43-7 ¶¶ 18, 20-23. The Knutson Declaration states, for example, that "the remote storage of usage policies . . . are thereby less vulnerable to manipulation by the device user, at the same time accommodating real-time, continuous control concurrent with device usage, which improved the functionality of computer-based systems through improved security, effectiveness, and robustness of control." *Id.* ¶ 20. Plaintiff relies on the Knutson Declaration and similar arguments to support its position under *Alice* step two. Dkt. 43 at 24.

Defendant does not really dispute that the claims require remote storage of polices as to device usage, but disagrees with Plaintiff's characterization of this aspect of the claims as a technological improvement. Defendant's cited support for its disagreement, however, does not come from the intrinsic record of the Asserted Patents or from the Complaint, but from Federal Circuit caselaw. As Defendant argues:

> [p]erhaps the closest factual analogue is found in *BASCOM*, where the claims at issue generally recited a system for filtering internet content, located on a remote ISP server that associated each network account with at least one filtering scheme and set of filtering elements to permit customized filtering of Internet traffic for each account.

Dkt. 46 at 6 (citing *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1345 (Fed. Cir. 2016)). Defendant also relies on *Bascom* to support its argument that remote storage of polices was a well-known and conventional concept prior to the issuance of the relevant patents. *Id.* at 7 n.13.

In *Bascom*, the Federal Circuit concluded that the claims were abstract under *Alice* step one. However, the Federal Circuit also concluded that the claims were patent-eligible under *Alice* step two. 827 F.3d at 1349-50. As the Federal Circuit explained

> "in other cases involving computer-related claims, there may be close calls about how to characterize what the claims are directed to." [*Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016).] "In such cases," we noted, "an analysis of whether there are arguably concrete improvements in the recited computer technology could take place under step two." *Id.* That is, some inventions' basic thrust might more easily be understood as directed to an abstract idea, but under step two of the *Alice* analysis, it might become

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV18-01519 JAK (PLAx) | Date | February 28, 2019 |
|---|---|---|---|
| Title | Kajeet, Inc. v. Qustodio, LLC | | |

clear that the specific improvements in the recited computer technology go beyond "well-understood, routine, conventional activit[ies]" and render the invention patent-eligible. *See Alice*, 134 S.Ct. at 2359.

*Id.* at 1348.

After agreeing at step one with the district court that the claims were drawn to the abstract idea of filtering content, the Federal Circuit found that "the installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user" provided the claims with an inventive concept under *Alice* step two. *Id.* at 1350; *see also id.* ("As is the case here, an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces.").

In its reply brief, Defendant fails to address the holding in *Bascom* on which Plaintiff relies*, i.e.,* that the claims at issue in that case were patent-eligible. *See* Dkt. 43 at 24. At the hearing, Defendant suggested that the analysis in *Bascom* of *Alice* step two is distinguishable from what should be conducted as to the claims at issue here. Defendant argued that the claims at issue in *Bascom* concerned a specific method of filtering, but in this case, the claims are only drawn to the "general concept of remote storage." However, when considering a motion to dismiss, all reasonable inferences are drawn in favor of the non-moving party. Under that standard, Defendant's position is not persuasive. It also conflicts somewhat with Defendant's assertion in its reply brief that the claims at issue in *Bascom* are "perhaps the closest factual analogue" to the claims asserted in this case.

Decisions after *Bascom* have reached similar patentability determinations with respect to the placement or arrangement of claimed computer components at *Alice* step one. They did so based on the disclosure in the patent intrinsic record. *See, e.g.*, *Ancora Techs*, 908 F.3d 1343; *Visual Memory*, 867 F.3d 1253. Defendant asserts that the inquiry at *Alice* step one is purely legal and can only be conducted by reviewing the patent intrinsic record. Dkt. 46 at 2. On this basis, Defendant argues that Plaintiff cannot rely on extrinsic evidence to create a disputed, inferred fact that would warrant the deferral of a determination of whether the claims are drawn to an abstract idea under *Alice* step one. *Id.* at 3-4.

Although in many instances, the *Alice* step one inquiry turns solely on the patent intrinsic record, the position that there cannot be underlying factual disputes in an *Alice* step one inquiry is not supported by legal authority. Indeed, the general rule is that there is always the possibility of the need for factual determinations in connection with an analysis about the scope of the patent intrinsic record. In the context of claim construction, those factual determinations ordinarily are resolved by the court. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015) ("In some cases . . . the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period . . . . In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence.").

Assuming without deciding that the asserted claims here are drawn to an abstract idea, it is now clear that the inquiry at *Alice* step two may involve and require the assessment of underlying questions of fact. *See Aatrix*, 882 F.3d at 1128 ("Whether the claim elements or the claimed combination are well-understood, routine, conventional is a question of fact."). On a motion to dismiss, however, the analysis must be "based on the sources properly considered on a motion to dismiss, such as the complaint, the

Page **7** of **9**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV18-01519 JAK (PLAx) | Date | February 28, 2019 |
|----------|--------------------------|------|-------------------|
| Title | Kajeet, Inc. v. Qustodio, LLC | | |

patent, and materials subject to judicial notice." *Id.*; *see also Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, No. 2017-2508, 2019 WL 453489, at *9 (Fed. Cir. Feb. 6, 2019) (finding district court in the First Circuit did not abuse its discretion in declining to consider an expert declaration submitted in opposition to a Rule 12(b)(6) motion).

Here, as noted, Plaintiff relies primarily on the Knutson Declaration to support its argument that the combination of elements in the asserted claims provides an inventive concept. If the statements in the Knutson Declaration are accepted,[3] *Bascom*, as well as Defendant's statements about that decision, suggest that, at least on a motion to dismiss, with all reasonable inferences drawn in favor of the non-moving party, it would be premature to determine that the asserted claims are drawn to patent-ineligible subject matter. In the Ninth Circuit, however,

> [g]enerally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). When "matters outside the pleading are presented to and not excluded by the court," the 12(b)(6) motion converts into a motion for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). Then, both parties must have the opportunity "to present all the material that is pertinent to the motion." *Id.*

> There are two exceptions to this rule: the incorporation-by-reference doctrine, and judicial notice under Federal Rule of Evidence 201.

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). Because the Knutson Declaration, rather than the materials properly and ordinarily considered on a motion to dismiss, forms the principal basis for Plaintiff's argument under *Alice* step two,[4] judicial and party economy are best served by having Plaintiff file an amended pleading that includes express, factual allegations consistent with the patent intrinsic record that support its position under both steps of *Alice. See Aatrix*, 882 F.3d at 1126-27 (it would not be futile to allow the plaintiff leave to file a proposed second amended complaint with allegations that, taken as true, "would directly affect the district court's patent eligibility analysis."). It is not appropriate to make a determination regarding patent eligibility until after Plaintiff has had the opportunity to do so.

III. **Conclusion**

---

[3] At the hearing, Defendant argued that the Knutson Declaration includes only one conclusory statement related to *Alice* step two, which was insufficient to support Plaintiff's position. Knutson Decl., ¶ 29. Paragraph 29 of this declaration is broader than that. Moreover, Defendant's position fails to acknowledge that, under Federal Circuit caselaw, the issue of the placement of claimed elements in a computer system has been considered in terms of both *Alice* step one and *Alice* step two. Therefore, Knutson's statements regarding *Alice* step one may be relevant to the *Alice* step two inquiry. For all of these reasons, Plaintiff has presented a sufficient basis to grant it leave to amend the Complaint.

[4] At the hearing, Plaintiff asserted that certain allegations in the Complaint support its arguments relating to remote storage of policies. However, neither of the allegations in the Complaint identified at the hearing provides sufficient support for this position. *See* Dkt. 1 ¶¶ 13, 31.

NOTICE OF SUPPLEMENTAL AUTHORITY IN FURTHER SUPPORT OF UBIQUITOUS CONNECTIVITY'S
MOTION TO AMEND ITS COMPLAINT [Dkt. No. 34]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV18-01519 JAK (PLAx) | Date | February 28, 2019 |
|---|---|---|---|
| Title | Kajeet, Inc. v. Qustodio, LLC | | |

For the reasons stated in this Order, the Motion is **GRANTED**, without prejudice, with any amended complaint to be filed by March 14, 2019, and consistent with its analysis.

**IT IS SO ORDERED.**

_____ : _____

Initials of Preparer   ak
_____

Page **9** of **9**

N.D. OKLA. CASE NO. 4:18-CV-00368-JED-FHM                                Page |BB-9
NOTICE OF SUPPLEMENTAL AUTHORITY IN FURTHER SUPPORT OF UBIQUITOUS CONNECTIVITY'S
MOTION TO AMEND ITS COMPLAINT [Dkt. No. 34]

**EXHIBIT CC**

*RingCentral, Inc. v. Dialpad, Inc.*, No. 18-cv-05242-JST, 2019 U.S. Dist. LEXIS 37901 (N.D. Cal. Mar. 8, 2019) (Opinion granting Motion Dismiss With Leave to Amend Complaint)

No *Shepard's* Signal™
As of: March 19, 2019 7:52 PM Z

## *RingCentral, Inc. v. Dialpad, Inc.*

United States District Court for the Northern District of California

March 8, 2019, Decided; March 8, 2019, Filed

Case No. 18-cv-05242-JST

**Reporter**
2019 U.S. Dist. LEXIS 37901 *; 2019 WL 1102986

RINGCENTRAL, INC., Plaintiff, v. DIALPAD, INC., Defendant.

## Core Terms

message, patent, server, user, synchronization, inventive, unread, abstract idea, configured, department member, plurality, corresponding, interfaces, network, eligible, specification, routing, technological, fax, distributed, mobile, outsider, generic, virtual, first client, parameters, voicemail, handling, includes, updating

**Counsel:** **[*1]** For RingCentral, Inc., Plaintiff: Clement S. Roberts, LEAD ATTORNEY, Orrick, Herrington & Sutcliffe LLP, San Francisco, CA; Amy Kathleen VanZant, Lillian J. Mao, Orrick, Herrington & Sutcliffe LLP, Menlo Park, CA; Evan David Brewer, Orrick Herrington & Sutcliffe LLP, Menlo Park, CA; Johanna Lynn Jacob, Orrick, Herrington & Sutcliffe LLP, Los Angeles, CA; Will Hussein Melehani, Orrick Herrington & Sutcliffe LLP, Irvine, CA.

For Dialpad, Inc., Defendant: Jose Luis Martinez, Joseph Taylor Gooch, Maya Perelman, Ryan K.M. Wong, Sharif E. Jacob, Stuart L. Gasner, Warren Andrew Braunig, Keker, Van Nest and Peters LLP, San Francisco, CA.

**Judges:** JON S. TIGAR, United States District Judge.

**Opinion by:** JON S. TIGAR

## Opinion

## ORDER GRANTING MOTION TO DISMISS

Re: ECF No. 29

Before the Court is Defendant Dialpad, Inc.'s motion to dismiss. ECF No. 29. The Court will grant the motion.

## I. BACKGROUND

Plaintiff RingCentral, Inc. and Defendant Dialpad, Inc. are competitors in the "cloud-based unified communications" market. ECF No. 24 ¶¶ 1-2. Both offer voice, video, and messaging services. *Id.* RingCentral alleges that Dialpad offers four levels of "a business PBX [private branch exchange] cloud based VoIP [Voice over Internet Protocol] service": **[*2]**

> (1) Dialpad Standard includes unlimited calling and text-based messaging in the United States and Canada, unlimited conferencing with up to 10 participants, HD video calling, single sign-on, softphones, and VoiceAI; (2) Dialpad Pro includes these same features plus call center, international offices, department audio recording, and voice transcription; and (3) Dialpad Enterprise includes all of the features of Dialpad Pro plus Enterprise SLA and Admin APIs. . . . In December 2017, Dialpad launched Dialpad Free, which purports to be a zero-cost Web-based free business VoIP phone system for businesses with five employees or less. Dialpad Free is a scaled-down version of Dialpad Pro and does not include certain features, including the ability to send and receive fax messages.

*Id.* ¶¶ 11-12. In its first amended complaint, RingCentral alleges that these products infringe four of RingCentral's patents: U.S. Patent Nos. 8,483,367 ("the '367 patent"); 8,355,496 ("the '496 patent"); 7,702,669 ("the '669 patent"); and 8,600,363 ("the '363 patent"). *Id.*

Dialpad contends that the asserted claims are patent-ineligible subject matter under *35 U.S.C. § 101* and now moves to dismiss all four patent infringement causes of

NOTICE OF SUPPLEMENTAL AUTHORITY IN FURTHER SUPPORT OF UBIQUITOUS CONNECTIVITY'S
MOTION TO AMEND ITS COMPLAINT [Dkt. No. 34]

action under *Federal Rule of Civil Procedure 12(b)(6)*.

## II. LEGAL STANDARD

To survive a *Rule 12(b)(6)* motion to dismiss, a complaint must contain sufficient factual matter that, when **[\*3]** accepted as true, states a claim that is plausible on its face. *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While this standard is not a probability requirement, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks and citation omitted). In determining whether a plaintiff has met this plausibility standard, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff. *Knievel v. ESPN, 393 F.3d 1068, 1072 (9th Cir. 2005)*.

"*Section 101* of the Patent Act defines the subject matter eligible for patent protection" by providing that "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof" may be patented. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l, 573 U.S. 208, 216, 134 S. Ct. 2347, 82 L. Ed. 2d 296, 189 L. Ed. 2d 296 (2014)*; *35 U.S.C. § 101*. It is well-established that "abstract ideas are not patentable." *Alice, 573 U.S. at 216* (internal quotation marks and citation omitted). However, "an invention is not rendered ineligible for patent simply because it involves **[\*4]** an abstract concept." *Id. at 217*. Courts must distinguish between patents that claim abstract ideas, on the one hand, and patents "that claim patent-eligible applications of those concepts," on the other hand. *Id.*

To draw this distinction, courts engage in a two-step analysis. At step one, courts determine whether the claims at issue are "directed to" an abstract idea. *Id.* Claims that are "directed to a specific improvement in computer functionality" or "to a specific implementation of a solution to a problem in the software arts" are not directed to an abstract idea. *Enfish, LLC v. Microsoft Corp., 822 F.3d 1327, 1338, 1339 (Fed. Cir. 2016)*. "In cases involving software innovations, this inquiry often turns on whether the claims focus on 'the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an "abstract idea"

for which computers are invoked merely as a tool.'" *Finjan, Inc. v. Blue Coat Sys., Inc., 879 F.3d 1299, 1303 (Fed. Cir. 2018)* (quoting *Enfish, 822 F.3d at 1335-36*). "The purely functional nature of [a] claim confirms that it is directed to an abstract idea, not to a concrete embodiment of that idea." *Affinity Labs of Texas, LLC v. Amazon.com Inc., 838 F.3d 1266, 1269 (Fed. Cir. 2016)*. Additionally, a claim that could be performed by a human, excising generic computer-implemented steps, is often abstract. *Intellectual Ventures I LLC v. Symantec Corp., 838 F.3d 1307, 1318 (Fed. Cir. 2016)*; *see also Papst Licensing GmbH & Co. KG v. Xilinx Inc., 193 F. Supp. 3d 1069, 1090 (N.D. Cal. 2016)*, aff'd, *684 F. App'x 971 (Fed. Cir. 2017)* ("[A]utomation of a process using a computer is . . . insufficient **[\*5]** to save the asserted claims from abstractness.").

If the claims are directed to an abstract idea, courts proceed to step two and "consider the elements of each claim both individually and as an ordered combination" to determine "whether [the claim] contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice, 573 U.S. at 217, 221* (internal quotation marks and citation omitted). "Stating an abstract idea while adding the words 'apply it' is not enough for patent eligibility. Nor is limiting the use of an abstract idea to a particular technological environment." *Id. at 223* (internal quotation marks and citations omitted). Instead, this test "is satisfied when the claim limitations involve more than performance of well-understood, routine, and conventional activities previously known to the industry." *Berkheimer v. HP Inc., 881 F.3d 1360, 1367 (Fed. Cir. 2018)* (internal quotation marks, alteration, and citation omitted). Both steps of the *Alice* inquiry are informed by "the claims in light of the written description." *Amdocs (Israel) Ltd. v. Openet Telecom, Inc., 841 F.3d 1288, 1299 (Fed. Cir. 2016)*.

"Whether a claim recites patent eligible subject matter is a question of law which may contain disputes over underlying facts." *Berkheimer, 881 F.3d at 1368*. But this does not mean that patent eligibility cannot be decided on a motion **[\*6]** to dismiss or motion for summary judgment, as "not every *§ 101* determination contains genuine disputes over the underlying facts material to the *§ 101* inquiry." *Id.* "[P]atent eligibility can be determined at the *Rule 12(b)(6)* stage . . . when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc., 882 F.3d 1121, 1125 (Fed. Cir. 2018)*. In some cases, for example, the factual question of "[w]hether the claim elements or the claimed combination are well-understood, routine, [or]

NOTICE OF SUPPLEMENTAL AUTHORITY IN FURTHER SUPPORT OF UBIQUITOUS CONNECTIVITY'S
MOTION TO AMEND ITS COMPLAINT [Dkt. No. 34]

conventional" may "be answered adversely to the patentee based on the sources properly considered on a motion to dismiss, such as the complaint, the patent, and materials subject to judicial notice."[1] *Id. at 1128*. "If there are claim construction disputes at the *Rule 12(b)(6)* stage, . . . either the court must proceed by adopting the non-moving party's constructions, or the court must resolve the disputes to whatever extent is needed to conduct the *§ 101* analysis, which may well be less than a full, formal claim construction." *Id. at 1125* (citations omitted).

## III. DISCUSSION

### A. Preliminary Matters

Before addressing each of the patents in detail, the Court resolves two issues that concern more than one patent. **[*7]** First, RingCentral notes that the Patent and Trademark Office found aspects of the '367, '496, and '669 patents to be distinguishable from the prior art. ECF No. 32-1 at 7 (notice of intent to issue *inter partes* reexamination certificate from '669 patent file history); ECF No. 32-2 at 3 (notice of allowability from '496 patent file history); ECF No. 32-3 at 3-4 (notice of allowability from '367 patent file history). However, these determinations are not relevant to the Court's analysis of patent eligibility. *SAP America, Inc. v. InvestPic, LLC, 898 F.3d 1161, 1163 (Fed. Cir. 2018)* ("Nor is it enough for subject-matter eligibility that claimed techniques be novel and nonobvious in light of prior art, passing muster under *35 U.S.C. §§ 102* and *103*."); *Intellectual Ventures I v. Symantec, 838 F.3d at 1315* (holding that a "finding that Symantec did not prove by clear and convincing evidence that three particular prior art references do not disclose all the limitations of or render obvious the asserted claims does not resolve the question of whether the claims embody an inventive concept").

Second, relying on *Aatrix, 882 F.3d at 1125*, RingCentral argues that the Court must assume as true the complaint's allegations that the patents use "unconventional techniques." ECF No. 31 at 16 (citing ECF No. 24 ¶ 36); *id.* at 21 (citing ECF No. 24 ¶ 28); *id.* at 29 (citing ECF No. 24 ¶ 16). But, unlike the proposed

amended complaint that **[*8]** the Federal Circuit found sufficient to prevent dismissal in *Aatrix*, RingCentral's complaint does not allege "specific" facts "suggest[ing] that the claimed invention is directed to an improvement in the computer technology itself and not directed to generic components performing conventional activities." *882 F.3d at 1126-28*. Instead, the "unconventional" allegations are conclusory, and the Court need not accept them as true. *In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008)*.

The Court now turns to the four patents at issue.

### B. The '367 Patent

The '367 patent, "Messaging in a Hosted Private Branch Exchange," describes a "method and system to provide routed messages that can be routed over the Internet according to custom routing rules." ECF No. 24-1 at 2, 13. The claimed system uses a "message management server" to distribute messages, according to distribution rules, among members of the same department or between the department and an outside (i.e., non-department) user. *Id.* at 13-15, 17. For example, a message from one department member might be sent only to one other department member or to the entire department. *Id.* at 13. A message from an outside user addressed to the department is distributed to one or more department members based on distribution rules — for example, all department members **[*9]** who are "on duty" or based on the subject matter of the message as "determined by the application of well-known natural language processing techniques ('NLP') to the message." *Id.* at 17. For messages sent to outside users, the system indicates the identity of the individual sender only to other department users; the outside user receives only "an indication that the message is from the department, i.e. without identifying the particular department member sending the message." *Id.*

Messages also include "thread identifiers," which track messages through the system and, for example, allow the same department members to "be assigned responsibility for responding to non-department caller's messages sent to the department." *Id.* at 18. Multiple department members may respond to the same thread, with department members seeing the identity of each

[1] The Court grants both parties' unopposed requests for judicial notice of portions of the relevant patent file histories. ECF Nos. 30, 32; *see, e.g., Phigenix, Inc. v. Genentech Inc., No. 15-cv-01238-BLF, 2016 U.S. Dist. LEXIS 195072, 2016 WL 7985261,* *at *3 (N.D. Cal. Jan. 12, 2016)* (taking judicial notice of excerpts from a patent file history because they were "publicly available government records, the accuracy of which have not been questioned").

RingCentral, Inc. v. Dialpad, Inc.

message's author but the outside user receiving no "indication that different individual department members have sent messages within the message thread." *Id.* at 20.

RingCentral asserts claims 1, 3, 4, 7, and 8. ECF No. 24 ¶ 47. The parties agree that claim 1, the only independent claim, is representative.[2] Claim 1 recites:

A hosted private branch exchange (PBX) system comprising: **[*10]**

non-transitory storage that includes subscriber identifying information that identifies a subscriber to a message routing service;

non-transitory storage that includes distribution rules information associated with the identified subscriber; and

a message management server configured to receive a message sent over the Internet to the identified subscriber and to send the message over the Internet to one or more devices according to the distribution rules associated with the identified subscriber;

wherein the subscriber identifying information identifies a department subscriber to the message routing service and department members;

wherein the distribution rules information includes department message distribution rules associated with the identified department subscriber;

wherein the department message distribution rules include a first rule for distribution of a message received from a department outsider that is directed to the department;

wherein the message management server distributes messages to the identified department members, according to the first rule, that include content of a message received from the department outsider and directed to the department;

wherein the message management **[*11]** server is configured to associate a thread identifier to a message received from a department outsider and to include the associated thread identifier with the messages that it distributes to the identified department members according to the first rule;

wherein the department message distribution rules include a second rule for distribution of a message

received from a department member that is directed to a department outsider;

wherein the message management server distributes messages to a department outsider and to the identified department members, according to the second rule, that include message content received from a department member that is directed to the department outsider;

wherein the message management server provides an indication of an identity of the department member that the message content is received from in the messages distributed to the identified department members; and

wherein the message management server provides an indication in the message distributed to the identified department outsider that the message content is received from the department but does not provide an indication in the message distributed to the identified department outsider of the identity **[*12]** of the department member that the message content is received from.

ECF No. 24-1 at 20-21.

At step one, Dialpad analogizes the claimed system to a corporate mailroom. RingCentral counters that the "real-time" nature of communications makes the analogy inapt, but the Court disagrees. Corporate mailrooms "receive correspondence, keep business rules defining actions to be taken regarding correspondence based on attributes of the correspondence, apply those business rules to correspondence, and take certain actions based on the application of business rules," including "gating the message for further review, . . . and also releasing, deleting, returning, or forwarding the message." *Intellectual Ventures I v. Symantec, 838 F.3d at 1317*. Likewise, here, by referencing a department roster, a person could readily determine whether a message comes from within that department or from an outsider and then use a set of distribution rules to route copies of that message to appropriate department members. A person could also assign a reference number to the message and keep a file containing all messages associated with that reference number. And a person could, for messages sent to an outsider, replace the sender's identifying information with **[*13]** that of the department only.[3] "[W]ith the exception of generic

---

[2] Consequently, the Court need not discuss every claim in determining the validity of the patent. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n, 776 F.3d 1343, 1348 (Fed. Cir. 2014)* (no need to address more than a

representative claim when "all the claims are substantially similar and linked to the same abstract idea" (internal quotation marks and citation omitted)).

[3] Contrary to RingCentral's argument, "permit[ting] the department to present a unified, single 'face' to the outside" is

NOTICE OF SUPPLEMENTAL AUTHORITY IN FURTHER SUPPORT OF UBIQUITOUS CONNECTIVITY'S
MOTION TO AMEND ITS COMPLAINT [Dkt. No. 34]

RingCentral, Inc. v. Dialpad, Inc.

computer-implemented steps, there is nothing in the claims themselves that foreclose them from being performed by a human, mentally or with pen and paper," and the "patent is directed to a conventional business practice . . . in the context of electronic communications." *Id. at 1318*. Although RingCentral makes much of the fact that the patented claim is designed to work with text messages in real-time, it points to no "specific asserted improvement in computer capabilities" and fails to explain how the specified tasks could not be performed by humans. *Enfish, 822 F.3d at 1336*. Nor does RingCentral identify anything in the claim or specification that specifies a "real-time" or immediate response, and the phrase "real-time" appears nowhere in the patent. "While the claimed system and method certainly purport to accelerate the process of [routing messages], the speed increase comes from the capabilities of a general-purpose computer, rather than the patented method itself." *FairWarning IP, LLC v. Iatric Sys., Inc., 839 F.3d 1089, 1095 (Fed. Cir. 2016)*.

RingCentral asserts that its claim — and, in particular, its use of specific rules — is similar to the claim found to be patent eligible in *McRO, Inc. v. Bandai Namco Games America Inc., 837 F.3d 1299 (Fed. Cir. 2016)*. However, as the Federal Circuit subsequently **[*14]** explained, a claim is not made patent eligible simply because it "recite[s] using one of a few possible rules to analyze . . . data." *FairWarning IP, 839 F.3d at 1094*. To the contrary:

> The claimed rules in *McRO* transformed a traditionally subjective process performed by human artists into a mathematically automated process executed on computers. . . . [T]he traditional process and newly claimed method stood in contrast: while both produced a similar result, i.e., realistic animations of facial movements accompanying speech, the two practices produced those results in fundamentally different ways.

*Id.* The key to finding the *McRO* claim patent eligible was that "the claimed computer-automated process and the prior method were [not] carried out in the same way." *McRO, 837 F.3d at 1314*. In this case, as in *FairWarning IP*, the claim "merely implement[s] an old practice in a new environment." *839 F.3d at 1094*. The claim is therefore directed to an abstract idea.

Turning to step two, the Court considers whether the claim "contains an inventive concept sufficient to

transform the claimed abstract idea into a patent-eligible application." *Alice, 573 U.S. at 221*. The Court finds that it does not. The elements of the claim, as well as the specification, refer only to conventional computer **[*15]** equipment, and RingCentral does not contend otherwise. Instead, RingCentral argues that the '367 patent "offers a new solution to a new type of problem with virtual PBX call centers," and that, "[w]hen the claims of the '367 patent are examined as a whole, it is evident that the specific interaction between the distribution rules and the message management system results in a 'particular arrangement of elements' that yields a 'technical improvement over prior art ways of managing department-directed SMS messages." ECF No. 31 at 27-28 (quoting *BASCOM Global Internet Servs., Inc.v. AT&T Mobility LLC, 827 F.3d 1341, 1350 (Fed. Cir. 2016))*. But RingCentral cites to nothing in the claims or specification of the '367 patent that supports its assertions that its identified problem is new to virtual PBX systems, or that its claimed arrangement of elements yields any specific technical improvements over the prior art, and it is to that language that courts must look to determine whether the patent "constitutes a concrete implementation of the abstract idea in the form of an inventive concept." *Affinity Labs, 838 F.3d at 1271* (internal quotation marks and citation omitted). Unlike the claims at issue in *DDR Holdings, LLC v. Hotels.com, L.P.*, on which RingCentral relies, the claims here "recite the performance of some [known] business practice," and **[*16]** "the claimed solution is [not] necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *773 F.3d 1245, 1257 (Fed. Cir. 2014)*. "Nor, in addressing the second step of *Alice*, does claiming the improved speed or efficiency inherent with applying the abstract idea on a computer provide a sufficient inventive concept." *Intellectual Ventures I LLC v. Capital One Bank (USA), 792 F.3d 1363, 1367 (Fed. Cir. 2015)*. The claim does not contain an inventive concept sufficient to render it patent eligible.

For all of the above reasons, the '367 patent is invalid.

## C. The '496 Patent

The '496 patent, "Call Management Interfaces," describes "[s]ystems, methods and computer program products for generating and displaying various user interfaces for configuring one or more call handling rules

---

not an unconventional distribution rule. ECF No. 31 at 25. Businesses regularly respond to customers using a generic

mailing address, email address, or phone number.

NOTICE OF SUPPLEMENTAL AUTHORITY IN FURTHER SUPPORT OF UBIQUITOUS CONNECTIVITY'S
MOTION TO AMEND ITS COMPLAINT [Dkt. No. 34]

RingCentral, Inc. v. Dialpad, Inc.

associated with managing virtual PBX service rendered at an extension." ECF No. 24-2 at 2, 21. "The virtual PBX services can provide, for example, a main number, and calls made to the main number can be managed according to one or more sets of call handling rules associated with the virtual PBX services and which can be configured through the user interfaces." *Id.* at 21. "For example, when an outside caller calls the virtual PBX main number for a small business, and chooses an extension, the extension user associated **[*17]** with that extension can be reached on a predefined mobile device, home telephone, office phone or other phone type according to the call handling rules." *Id.* at 22. These rules might, for instance, provide forwarding of calls to different numbers based on the time of day the calls are received. *Id.* at 28-29. "The user interfaces can be web-based interfaces accessible through a browser, and can be accessed only after a user or administrator has setup and activated the virtual PBX services." *Id.* at 21.

RingCentral asserts claims 1, 3-11, 13, 15, and 16. ECF No. 24 ¶ 53. The parties agree that claim 1 is representative. Claim 1 recites:

A method comprising:

> receiving a user request to access profile information associated with an extension on a virtual private branch exchange (PBX) network;
> retrieving one or more configuration parameters associated with the extension, wherein the one or more configuration parameters include a plurality of sets of call handling rules for handling incoming calls to the extension, and wherein each set of call handling rules is associated with calls made during different respective periods of time;

> presenting a user interface including displaying the one or more retrieved configuration parameters **[*18]** in the interface;
> receiving a user command to update at least one configuration parameter, wherein the at least one updated configuration parameter includes an update to a first call handling rule in a first set of call handling rules associated with calls made during a first period of time; and
> updating the profile information based on the at least one updated configuration parameter, wherein updating the profile information comprises updating the first call handling rule for calls made during the first period of time.

ECF No. 24-2 at 33.

At step one, the Court concludes that the claim is directed to the abstract ideas of routing telephone calls based on

routing parameters, such as time of day, and allowing a user to modify those routing parameters. As Dialpad persuasively argues, these are functions that humans have routinely performed and are therefore abstract. *See, e.g., Intellectual Ventures I v. Symantec, 838 F.3d at 1316-18* (finding a claim "receiving, screening, and distributing e-mail" to be abstract); *Twilio, Inc. v. Telesign Corp., 249 F. Supp. 3d 1123, 1147 (N.D. Cal. 2017)* ("[S]electing the best message routing option based on separately-transmitted feedback is a fundamental human activity, applied to a specific technical environment," and is "an abstract idea."). For example, corporate executives might **[*19]** tell their assistants that calls are directed to their office phone number during certain hours, their mobile phone number during other hours, and their home phone number during still other hours. RingCentral makes much of the claim's user interface to update those routing parameters, but the method describes nothing more than an automated way of an executive calling his or her assistant to make those changes. In both scenarios, the control is in the user's hands, and someone or something else actually makes the modifications. The claimed method is not directed to any "specific asserted improvement in computer capabilities," nor is it "necessarily rooted in computer technology." *Enfish, 822 F.3d at 1336*; *DDR Holdings, 773 F.3d at 1257*.

The Court also finds the claim to be patent ineligible under step two. As with the '367 patent, RingCentral does not contend that the elements at issue in the '496 patent — virtual PBX systems and user interfaces — are inventive. Instead, it argues that the patent survives step two because of its "non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM, 827 F.3d at 1350*. In particular, RingCentral argues that "the '496 patent departs from prior art virtual PBX systems by relocating the provisioning of a user's time-based call-handling **[*20]** settings to each user." ECF No. 31 at 20. However, unlike the patent at issue in *BASCOM*, nothing in the '496 patent requires location of any tool at any specific location. *See BASCOM, 827 F.3d at 1350* ("The inventive concept described and claimed in the '606 patent is the installation of a filtering tool *at a specific location*, remote from the end-users, with customizable filtering features specific to each end user. This design gives the filtering tool both the benefits of a filter on a local computer and the benefits of a filter on the ISP server." (emphasis added)). In this case, although the claim refers to a "user request," "user interface," and "user command," neither it nor the specification provide that these be housed in any particular location or describe how the claimed method improves any

NOTICE OF SUPPLEMENTAL AUTHORITY IN FURTHER SUPPORT OF UBIQUITOUS CONNECTIVITY'S
MOTION TO AMEND ITS COMPLAINT [Dkt. No. 34]

computer capabilities. ECF No. 24-2 at 33. In fact, the written description explains that "[a] user *or an administrator* can access the user interfaces using, for example, *a web browser available on a mobile device or personal computing platform*, and access the corresponding account through the user interfaces after successful authentication." *Id.* at 25 (emphasis added). Thus, the language of the patent explicitly provides that an administrator, **[*21]** in addition to a user, can access the user interfaces, and that the interfaces may be accessed through any web browser, including one on a mobile device. This is not inventive.

RingCentral's reliance on a single sentence in the patent does not change this result. The patent states that "[s]ervices and features typically are provisioned by the telecommunications network or on-premise servers and not the telephone device itself." ECF No. 24-2 at 21. But, as Dialpad correctly observes, "typically" is not equivalent to "exclusively." Similarly, as discussed above, the written description explains that the user interface is accessed via a web browser — a technique that is not unconventional.

Finally, RingCentral argues that dependent claims 8, 10, and 16 contain an inventive concept "by allowing the user to configure enhanced 911 [("E-911")] registration." ECF No. 31 at 21 n.7. "E-911 services . . . route an emergency call to a 911 dispatcher and provide[] the dispatcher with a geographic location (e.g., street address) from which the call is originated, while traditional 911 services route[] an emergency call to a 911 dispatcher without providing the dispatcher with geographic location information **[*22]** indicating where the call is originated." ECF No. 24-2 at 31. But RingCentral does not contend that it invented the E-911 system or the methods of registering for that system, and it points to no language in the claim or specification indicating that its claimed method in any way "improved [this] existing technological process." *Alice, 573 U.S. at 223.* These dependent claims do not contain an inventive concept.

For all of the above reasons, the '496 patent is invalid.

## D. The '669 and '363 Patents

Although RingCentral asserts two separate claims of patent infringement as to the '669 and '363 patents, the parties analyzed both patents together, and the Court

does the same. The '363 patent was granted on a continuation of the application that resulted in the '669 patent. ECF No. 24-4 at 2. Both patents are titled, "Synchronization in Unified Messaging Systems," and they share the same specification.[4] *Id.* at 2-7; ECF No. 24-3 at 2-12. The patents describe "a unified messaging system [that] includes a server configured to store a plurality of server messages, a client configured to store a plurality of client messages and a synchronization application which synchronizes the client messages with the server messages associated with the client." ECF No. 24-4 at 9. "[A] unified messaging system **[*23]** integrates several different communications media to allow a user to send and retrieve voice, fax, and messages (e.g., e-mail, text, etc.) from a single interface, whether it be a phone, a fax machine, or a personal computer." *Id.* (figure citations omitted). A given user may have one or more clients (i.e., devices). *Id.* Messages on the server "are grouped into message clusters, or mailboxes, that are associated with individual users, or groups of users." *Id.* (figure citations omitted).

The "synchronization application . . . receives the state of messages in the server message storage module on the server and compares it with the state of messages in the client message storage module on the client." *Id.* at 10 (figure citations omitted). It does so by using a "discrepancy assessment [that] involves comparing the indexes of the messages stored on the server with the indexes of the messages stored on the client. . . . The discrepancy assessment can further include comparing the statuses of the messages with the same indexes on the client and on the server." *Id.* at 10-11 (figure citations omitted). "The synchronization application [then] identifies a set of actions that need to be performed to synchronize the **[*24]** messages on the server with the messages on the client and subsequently performs those actions." *Id.* at 10 (figure citations omitted). These actions can include adding messages, deleting messages, or changing the status of a message to read or unread. *Id.* at 11. For example, "[i]f a message on the client has been marked as 'read' since the last synchronization, the corresponding message on the server is also marked as 'read,'" and vice-versa.[5] *Id.* (figure citations omitted).

The scope of the claimed invention is broad. For example, "[t]he invention and all of the functional operations described in this specification can be implemented in digital electronic circuitry, or in computer software, firmware, or hardware," and "can be

---

[4] The Court will cite only to the '363 specification when describing the shared specification.

[5] It is unclear whether the read or unread status of the message on the server or the client takes precedence.

NOTICE OF SUPPLEMENTAL AUTHORITY IN FURTHER SUPPORT OF UBIQUITOUS CONNECTIVITY'S
MOTION TO AMEND ITS COMPLAINT [Dkt. No. 34]

RingCentral, Inc. v. Dialpad, Inc.

implemented as one or more computer program products." *Id.* "A computer program . . . can be written in any form of programming language, including compiled or interpreted languages, and it can be deployed in any form, including as a stand-alone program or as a module, component, subroutine, or other unit suitable for use in a computing environment." *Id.* And "[a] computer program can be deployed to be executed on one computer or on multiple computers at one site or distributed across **[\*25]** multiple sites and interconnected by a communication network." *Id.* In addition, the written description allows that "[t]he invention can be implemented in a computing system that includes a back-end component (e.g., a data server), a middleware component (e.g., an application server), or a front-end component (e.g., a client computer having a graphical user interface or a Web browser through which a user can interact with an implementation of the invention," or any combination thereof, and "[t]he components of the system can be interconnected by any form or medium of digital communication," including "a local area network ('LAN'), e.g., a wireless LAN, and a wide area network ('WAN'), e.g., the Internet." *Id.* Finally, "the operations of the invention can be performed in a different order and still achieve desirable results." *Id.* at 12.

RingCentral asserts claims 22-23, 26-28, and 30-31 of the '669 patent and claims 1, 14, 16, and 29 of the '363 patent. The parties agree that claim 22 of the '669 patent and claim 16 of the '363 patent are representative. Claim 22 of the '669 patent recites:

A unified messaging system comprising:

a computer implemented server including a processor configured to store a plurality of server messages grouped into a message **[\*26]** cluster, the server messages including voicemail messages and fax messages for a client;
a first client configured to store a first plurality of client messages, the first client messages including voicemail messages and fax messages for the first client and corresponding to the plurality of server messages;
a first synchronization application for synchronizing the first client messages with the server messages associated with the first client including performing at least one synchronization action selected from the group consisting of:

a read/unread status of a first client message to read when a read/unread status of a corresponding server message is set to read and unread when the read/unread status of the corresponding server message is set to unread; and
a read/unread status of a server message to read when a read/unread status of a corresponding first client message is set to read, and unread when the read/unread status of the corresponding first client message is set to unread;

a second client that is not the first client configured to store, separately from the first plurality of client messages, a second plurality of client messages, the second client messages including voicemail **[\*27]** messages and fax messages for the second client and corresponding to the plurality of server messages;
a second synchronization application for synchronizing the second client messages with the server messages including performing at least one synchronization action selected from the group consisting of:

a read/unread status of a second client message to read when a read/unread status of a corresponding server message is set to read, and unread when the read/unread status of the corresponding server message is set to unread;
a read/unread status of a server message to read when a read/unread status of a corresponding second client message is set to read and unread when the read/unread status of the corresponding second client message is set to unread.

ECF No. 24-3 at 14.[6]

Claim 16 of the '363 patent recites:

A unified messaging system comprising:

a server having at least one processor and memory, the server capable of operatively coupling to a data network;
a server message storage module configured to store a plurality of server messages, the plurality of server messages including at least one voicemail or at least one fax;

a client message storage module configured to store a plurality of **[\*28]** client messages, the

---

[6] Original claims 1-21 were cancelled, and new claims 22-34 added, as a result of *inter partes* reexamination. ECF No. 24-3 at 14.

NOTICE OF SUPPLEMENTAL AUTHORITY IN FURTHER SUPPORT OF UBIQUITOUS CONNECTIVITY'S
MOTION TO AMEND ITS COMPLAINT [Dkt. No. 34]

plurality of client messages including at least one voicemail or at least one fax corresponding to the at least one voicemail or the at least one fax of the plurality of server messages; and

a synchronization application configured to:

> send a network request to the server over the data network; receive a network response to the network request from the server over the data network, the network response comprising state information about the plurality of server messages in the server message storage module;
>
> identify state information about the plurality of client messages in the client message storage module;
>
> perform a discrepancy assessment between the state information about the plurality of server messages and the state information about the plurality of client messages;
>
> create a list of one or more synchronization actions based on results of the discrepancy assessment; and
>
> perform the synchronization actions in the list.

ECF No. 24-4 at 13.

At step one, RingCentral analogizes this case to *Synchronoss Technologies, Inc. v. Dropbox, Inc., 226 F. Supp. 3d 1000, 1007 (N.D. Cal. 2016)*, in which the court concluded that several patents concerning the synchronization of devices were not directed to abstract ideas because they were "directed on their face to an improvement **[*29]** to computer functionality: a more-efficient mechanism for synchronizing data between systems connected to a network by updating only changed data (or 'difference information'), rather than recopying all information." However, in that case, the specifications explained that "the claims are directed to improving the manner in which computers synchronize data between devices connected to a network, by making that process faster, reducing the amount of bandwidth and storage space used, enabling synchronization across different data formats, and enabling synchronization without requiring devices to be physically connected." *Id. at 1008-09*. The patents at issue in this

case, by contrast, have no similar "express focus" on technological improvements. *Id. at 1009*; *see also BASCOM, 827 F.3d at 1349* (characterizing the claims in *Enfish, 822 F.3d at 1335-37*, which were found to be patent eligible, as "unambiguously directed to an improvement in computer capabilities"). Although RingCentral argues in its opposition that the claimed invention "reduces the risk of synchronization errors caused by connectivity issues, data corruption, or other technical issues" and "preserves computer and network resources and is more efficient than conventional processes," ECF No. 31 at **[*30]** 10, these arguments are not tied to anything in the claims or specifications that must form the basis of the Court's analysis. *Enfish, 822 F.3d at 1335* (step one analysis examines the "claims, considered in light of the specification"); *see also FairWarning IP, 839 F.3d at 1096-97* (rejecting suggestion that the "claimed invention recites a technological advance relating to accessing and combining disparate information sources" when the "claims [did] not recite any such improvement"); *Intellectual Ventures I v. Symantec, 838 F.3d at 1317* ("The written description is particularly useful in determining what is well-known or conventional.").

The Court concludes that, absent any "focus on a specific means or method that improves the relevant technology," the claims are "directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *McRO, 837 F.3d at 1314*. The functions described in the claims could all be performed by humans. For example, imagine a person who has two mobile devices (i.e., clients), which can receive both voicemail and fax messages, but who also keeps a master copy of his or her voicemail and fax messages on a desktop computer (i.e., the equivalent of a server copy). Imagine further that messages on all of those devices are stored in various electronic **[*31]** folders or mailboxes (i.e., clusters).[7] That person could decide at any time to synchronize the messages stored on the desktop with the messages on one or both of the mobile devices. To do so, the person — or an assistant to whom he or she made a synchronization request — could compare each folder or mailbox on the desktop with each folder or mailbox on the first mobile device, noting any discrepancies, including when the desktop and mobile device showed

---

[7] RingCentral repeatedly emphasizes the use of "clusters" as part of the asserted unconventional technique. But the specification defines a "cluster" as nothing more than a mailbox: "Messages are grouped into message clusters, *or mailboxes,* that are associated with individual users, or groups of users."

ECF No. 24-4 at 9 (emphasis added). While nothing in the claims appears to require the "cluster-based synchronization" that RingCentral describes in its opposition, ECF No. 31 at 10, the Court will adopt RingCentral's construction for purposes of this motion. *See Aatrix, 882 F.3d at 1125*.

NOTICE OF SUPPLEMENTAL AUTHORITY IN FURTHER SUPPORT OF UBIQUITOUS CONNECTIVITY'S
MOTION TO AMEND ITS COMPLAINT [Dkt. No. 34]

RingCentral, Inc. v. Dialpad, Inc.

different read or unread statuses for a particular message. The person could then synchronize the desktop copy with the copy on the first mobile device, making changes only where required, and then repeat the process for the second mobile device. Thus, "with the exception of generic computer-implemented steps, there is nothing in the claims themselves that foreclose them from being performed by a human." *Intellectual Ventures I v. Symantec, 838 F.3d at 1318*. The claims are directed to patent-ineligible abstract ideas.

Nor does the step two analysis render the claims patent eligible. RingCentral contends that "the claim limitations of both the '363 and '669 patents specify multiple inventive concepts, including an unconventional cluster-wide discrepancy-based synchronization process, synchronization **[*32]** of multiple types of messages (including, specifically, fax or voicemail messages), and the ability to synchronize message clusters across multiple client devices." ECF No. 31 at 15. However, as just described, without any specific improvement to existing technological processes, all of these asserted limitations "are themselves abstract"; they are therefore not inventive. *SAP America, 898 F.3d at 1168-69*. The Court's conclusion is bolstered by the breadth of the specification, which essentially provides that any combination of generic computer equipment may be used to implement the claimed method, which need not be performed in the described sequence. *Compare* ECF No. 24-4 at 11-12 *with, e.g., Amdocs, 841 F.3d at 1301* (finding claim to be patent eligible where it was "narrowly drawn to not preempt any and all generic enhancement of data in a similar system, and [did] not merely combine the components in a generic manner, but instead purposefully arrange[d] the components in a distributed architecture to achieve a technological solution to a technological problem specific to computer networks").

For all of the above reasons, the '669 and '363 patents are invalid.

## CONCLUSION

Having found all four asserted patents to be invalid, the Court grants Dialpad's motion **[*33]** to dismiss RingCentral's patent infringement complaint in its entirety. Although the Court doubts whether the identified deficiencies can be cured by amendment, the Court will nonetheless grant leave to amend solely to allow RingCentral an opportunity to attempt to plead patent eligibility. *See Aatrix, 882 F.3d at 1126-28* (finding abuse of discretion where district court denied leave to amend);

*Papst Licensing, 193 F. Supp. 3d at 1095* (dismissing with prejudice infringement claims where "the asserted claims are directed to patent-ineligible subject matter, a defect which cannot be cured through amendment of a complaint"). RingCentral may file a second amended complaint within 21 days of the date of this order. Failure to file a timely second amended complaint will result in dismissal with prejudice.

**IT IS SO ORDERED**.

Dated: March 8, 2019

/s/ Jon S. Tigar

JON S. TIGAR

United States District Judge

---

**End of Document**